Viktor **PETSCHEK** and Mary Petschek, Plaintiffs-Appellants,

v.

**UNITED STATES** of America, Defendant-Appellee.

No. 392, Docket 28678.

United States Court of Appeals Second Circuit.

Argued March 20, 1964.

Decided July 16, 1964.

M. Bernard Aidinoff, New York City (Sullivan & Cromwell, New York City) (Kendyl K. Monroe, New York City, of counsel), for plaintiffs-appellants.

Bruno Lederer, New York City (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

The sole issue in this appeal from a judgment of the District Court for the Southern District of New York dismissing plaintiffs' complaint for an income tax refund is the deductibility of legal fees and expenses paid by Viktor Petschek in 1955 and 1956. Judge Levet held the deduction to have been properly denied by the Commissioner, on the two grounds that the sums in controversy were not expenses for the production of income within § 212 of the Internal Revenue Code of 1954 and that, if they were, deduction was precluded by § 265(1), which prohibits deductions allocable to classes of income wholly exempt from federal income taxation. See 223 F. Supp. 497 (1963). We disagree, and direct judgment for the taxpayer.

Viktor Petschek, along with other members of his family, had owned stock in three Yugoslav corporations and in a Rumanian corporation doing business in those countries. Under § 127(a) (2) and (3), added to the Internal Revenue Code of 1939 by the Act of Oct. 21, 1942, 56 Stat. 852, Viktor took substantial war loss deductions in 1941 for his investments in these corporations; since his 1941 income was only $10,830.66, the bulk of these deductions did not result in any reduction in income tax.

The Yugoslav corporations were confiscated by the government of that nation in late 1946 and early 1947, without arrangements at the time for compensation, as part of a general program for the nationalization of private enterprise; the same occurred in 1948 with respect to the Rumanian corporation. In August, 1948, Yugoslavia paid $17,000,000 pursuant to a Claims Agreement, 62 Stat. 2658, as part of an over-all settlement of the claims of the United States and its nationals on account of various takings of property. Pursuant to the International Claims Settlement Act of 1949, 64 Stat. 12, this payment was placed in a special fund to be distributed to eligible claimants by an International Claims Commission which the Act established. An amendment to the Act, 69 Stat. 562, 571

(1955), created a Rumanian Claims Fund to receive proceeds of property of Rumania or its nationals which had been vested in and liquidated by the United States, and provided for similar distribution. Viktor filed claims against both funds; he paid legal fees and expenses of $5,171.51 in 1955 and of $6,609.23 in 1956 for the prosecution of these claims, which he took as deductions from gross income. He received payments of $155,246.37 on his Yugoslav claims in 1955, 1956 and 1957, and of $53,231.50 on his Rumanian claim in 1959 and 1960. Since these sums did "not exceed that part of the aggregate of the allowable deductions in prior taxable years on account of the destruction or seizure of property described in * * * section 127(a) which did not result in a reduction of any tax of the taxpayer," they were not "includible in gross income," Internal Revenue Code of 1954, § 1332(b) (1).

### Section 212

The District Court held that the legal fees were not paid "for the management, conservation, or maintenance of property held for the production of income," within I.R.C. § 212(2), since the "property" had been confiscated long before the fees were paid and Viktor's efforts were directed toward reimbursement rather than to recovery of the property itself; it did not explain why, even on that basis, the expenses would not have been made "for the production or collection of income" within § 212(1). Cf. C. I. R. v. Doering, 335 F.2d 738 (2 Cir. 1964). The court's approach was too narrow. If a business corporation had sought compensation for the confiscation of branches in Yugoslavia and Rumania, the deductibility of the legal fees under I.R.C. § 162 would hardly be questioned; indeed we upheld a very similar deduction with respect to seizures during World War I. C. I. R. v. Speyer, 77 F.2d 824 (2 Cir.), cert. denied, 296 U.S. 631, 56 S.Ct. 155, 80 L.Ed. 449 (1935); C. I. R. v. Ullman, 77 F.2d 827 (2 Cir.), cert. denied, 296 U.S. 631, 56 S.Ct. 155, 80 L.Ed. 449 (1935). As explained in Trust of Bingham v. C. I. R., 325 U.S. 365, 374, 65 S.Ct. 1232,

89 L.Ed. 1670 (1945), § 212 provides for deductions, "coextensive with the business deductions" allowed by § 162, in those "pecuniarily motivated" or "profit-seeking" activities which are neither the conduct of a taxpayer's "trade or business" on the one hand nor the mere satisfaction of "his needs as a human and those of his family" on the other. See Trent v. C. I. R., 291 F.2d 669, 671 (2 Cir. 1961); Ditmars v. C. I. R., 302 F.2d 481, 487 (2 Cir. 1962); Surrey & Warren, Federal Income Taxation, p. 272 (1960 ed.).

■■ Viktor's expenses were in that area. When a government has taken possession of property held by a taxpayer for investment, expenses incurred to regain this are deductible under § 212. Ruoff v. C. I. R., 277 F.2d 222 (3 Cir. 1960); so far as concerns the point relied on by the district judge, we perceive no sensible basis for different treatment when the foreign government has taken title and the taxpayer prosecutes a claim for compensation against a fund. It is indisputable that § 212 allows the owner of a building held for rental to deduct expenses incurred in suing a person who has damaged it; we see nothing in the language or in reason to indicate that Congress would have wished to withhold the deduction because the building was destroyed. Cf. United States v. Pate, 254 F.2d 480 (10 Cir. 1958).

■ To us the serious question on this aspect of the case is not the one that troubled the district judge but whether the legal fees fall within the implied exclusion of "capital expenditures" from the general language of § 212. See Regulations § 1.212–1(k) and (n). The drawing of this line has not been easy, as is demonstrated by the many cases cited in 4 Mertens, Law of Federal Income Taxation, §§ 25A.14, 25A.15 and 25A.16

(1960 ed.), and in the discussion of the corresponding problem under the business expense section, see ibid., §§ 25.20, 25.24, 25.25, 25.26, and the division of opinion, in the Tax Court and here, in C. I. R. v. Doering, supra. But on this issue also we rule with the taxpayer.

The fees were not paid in the "defense of title" to property as in Bowers v. Lumpkin, 140 F.2d 927, 151 A.L.R. 1366 (4 Cir.), cert. denied, 322 U.S. 755, 64 S.Ct. 1266, 88 L.Ed. 1585 (1944); title had been lost long ago and the taxpayer had no chance of regaining it. Neither were they paid in an effort to acquire specific property to the basis of which the fees would be added, as in Garrett v. Crenshaw, 196 F.2d 185 (4 Cir. 1952) and Kelly v. C. I. R., 228 F.2d 512 (7 Cir. 1956), or to reduce the cost of property already acquired, as in Iowa Southern Utilities Co. v. C. I. R., 333 F.2d 382 (8 Cir. 1964). The close question is whether the fees were not of the same nature as expenses incident to obtaining a condemnation award which, in Isaac G. Johnson & Co. v. United States, 149 F.2d 851 (2 Cir. 1945), we required to be capitalized as incident to the sale of a capital asset. Accord, Williams v. Burnet, 61 App.D.C. 181, 59 F.2d 357 (1932). Against this, however, are our decisions in Speyer and Ullman, supra, in which two of the judges who were later to join in Johnson had participated.[1] The distinction appears to be the narrow one between a taking which immediately creates a right to compensation, uncertain only as to the amount, and a confiscation which becomes the basis for a claim against assets later provided by the seizing government. The former can be reasonably assimilated to a contract of sale; the latter is more like a loss from a casualty for which compensation is subsequently secured—indeed, the case seems *a fortiori* for deductibility as against the situation where

---

1. Speyer might be distinguished on the basis that the taxpayer's bank accounts in Germany "were never taken over under the decree authorizing the Treuhander to do so," 77 F.2d at 825, so that Speyer was only retrieving what had always been legally his. However that may be, this distinction does not explain Ullman, where, as the record shows, the German Alien Property Custodian had completely taken over the assets and the Government's brief relied on Williams v. Burnet, supra.

at the very time of the loss the taxpayer had a contract right to compensation from an insurer. See Ticket Office Equipment Co. v. C. I. R., 20 T.C. 272, 280 (1953), aff'd on other grounds, 213 F.2d 318 (2 Cir. 1954); contra, Towanda Textiles, Inc. v. United States, 180 F. Supp. 373, 377–379 (Ct.Cl.1960), Judge Littleton dissenting. If the distinction seems fragile, that is not unusual in cases near a frontier, with large hinterlands on either side.

Moreover, considerations both of fairness and of harmony with the scheme of the War Loss Recovery provisions, §§ 1331–37, argue in favor of deductibility. An immediate deduction for the taking was required by § 127(a) of the 1939 Code, with provision for subsequent adjustment if a recovery was later secured. In a case falling within § 1332(b) (1) expenses necessary to effect a recovery will go permanently unrecognized if required to be netted against cash recovered; this contrasts with the condemnation cases where capitalization of the expenses will increase the basis of the asset that was taken and decrease the gain or increase the loss. See Brookes, Litigation Expenses and the Income Tax, 12 Tax L.Rev. 241, 252–54 (1957). We need not decide whether § 1332(b) (3) might require netting the allocable portion of the fees against the recovery in cases governed by that subsection.

### Section 265

I.R.C. § 265, which, with respect to business expenses, came into the income tax laws in 1934, 48 Stat. 691, and was retroactively broadened in 1942, 56 Stat. 819, provides so far as here material:

"No deduction shall be allowed for—

"(1) EXPENSES—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class * * * is received or accrued) wholly exempt from the taxes imposed by this subtitle."

I.R.C. § 1332, entitled "INCLUSION IN GROSS INCOME OF WAR LOSS RECOVERIES," after defining the "amount of the recovery," makes a threefold division. Section 1332(b) (1), here applicable, directs that so much of the recovery as does "not exceed that part of the aggregate of the allowable deductions in prior taxable years on account of the destruction or seizure of property * * which did not result in a reduction of any tax of the taxpayer * * * shall not be includible in gross income * * *." In direct contrast, § 1332(b) (2) prescribes that to the extent that the recovery represents sums the deduction of which did result in a tax reduction, it shall be treated as ordinary income. Under § 1332(b) (3), any excess of the recovery over prior deductions "shall be considered a gain on the involuntary conversion of property as a result of its destruction or seizure and shall be recognized or not recognized as provided in section 1033 (relating to involuntary conversions)."

Resolution of the issue under § 265 hinges in the first instance on the degree of magnification applied in reading the words "one or more classes of income * * * wholly exempt from the taxes imposed by this subtitle." The taxpayer is content with a low powered glass. He says that the "class of income" is "War Loss Recoveries" and that, far from being "wholly exempt," these are includible in gross income save for the particular species to which his belongs. The Government, using a stronger lens, claims that the relevant "class of income" is a war - loss - recovery - not - exceeding - prior - deductions - which - did - not - result - in - a - tax - benefit, and that this indeed is "wholly exempt." Either reading is possible, and there is no extrinsic evidence that Congress ever considered the problem. The case law on analogous issues favors the taxpayer. Hawaiian Trust Co. v. United States, 291 F.2d 761 (9 Cir. 1961); California & Hawaiian Sugar Refining Co. v. United

738

States, 311 F.2d 235 (Ct.Cl.1962); C. I. R. v. Universal Leaf Tobacco Co., 318 F.2d 658 (4 Cir. 1963); C. I. R. v. Mc-Donald, 320 F.2d 109 (5 Cir. 1963).

So, it seems to us, does the reason of the thing. Viktor Petschek has emerged with less than the value he had before the confiscation and has had to spend $11,780.78 in legal fees to accomplish that. If Congress had not required him to take the deduction in 1941, his later recoveries up to his basis would not have been income exempt from taxes, to which the prohibition of § 265 alone applies; they would not have been income at all. The result should not be different because he was required to take a useless deduction—one limited to his basis, 26 C.F.R. § 127(b)–1 (1949 ed.)—and then recovered that amount or less. The same theory of determination of amount of gain or loss by reference to the difference between realization and basis as is set down in § 1001 and as runs throughout the Code also governs the scheme of the war loss provisions. In this respect C. I. R. v. Speyer, supra, 77 F.2d at 825, is relevant although it concerned years when there was no statute like § 265. Congress recognized in the war loss provisions that although immediate deduction would be valuable to many taxpayers, e. g., corporations having large operations in this country as well as plants in enemy territory, it would yield no or little benefit to others; to that extent § 1332(b) (1) in effect eliminates the useless deduction and treats the recovery as putting the taxpayer back where he was before the war loss was suffered. We see no reason for thinking that Congress would have wished § 265 or its predecessors to outlaw the deductions of sums necessarily expended by taxpayers in order to stand still.

Beyond this, the construction urged by the government would lead to odd and inequitable results. A taxpayer who, in the year of his loss, was blessed with an income so large as to allow the use of his entire war loss deduction would unquestionably be entitled to deduct recovery expenses since the entire recovery would be included in gross income. On the other hand, a taxpayer like Petschek, whose war loss deduction had been virtually useless and who is permitted a tax-free recovery out of Congressional concern for the unfairness of taxing a person upon the mere restoration of the equivalent of what he previously had, would be denied the deduction of his equally necessary expenses. A taxpayer who presses a claim most of which will be taxed if he recovers would be permitted to deduct most of his expenses if he is wholly successful, would be denied any deduction if the fund was so small that the amount collected fell entirely in the § 1332(b) (1) category, but would be allowed the full deduction if he failed entirely to prove the claim. Such results seem far from the purpose for which § 265 and its predecessors were enacted.

The judgment dismissing the complaint is reversed with instructions to grant plaintiffs' motion for summary judgment.